UNITED STATES DISTRICT COURT
FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WB&B EXECUTIVE SEARCH, LLC, <br><br>  Plaintiff, <br><br> -*Against*- <br><br> CITY OF NEW YORK, NEW YORK CITY DEPARTMENT OF CORRECTION, NEW YORK CITY COMPTROLLER'S OFFICE, BRAD LANDER in his capacity as Comptroller of the City of New York, ADRIENNE ADAMS in her in his capacity as Speaker of the New York City Council, PAUL SHECHTMAN in his capacity as Deputy Commissioner of Legal Matters and General Counsel for the New York City Department of Correction, and KAT THOMSON in her capacity as Chief of Staff for the New York City Department of Correction, <br><br> Defendants. | COMPLAINT <br><br><br> Civil Action No.: _____ |

Plaintiff, by and through counsel CIVIL RIGHTS CONSORTIUM, respectfully alleges the following:

**PRELIMINARY STATEMENT**

Plaintiff brings the instant action for relief from the Defendant City of New York and Department of Correction's structural and institutional discrimination on the basis of race, and as to disparate treatment, all in violation of the laws and constitution of the United States, City and State of New York, resulting in the underlying purposeful breach of the Defendants' implied duty of good faith and fair dealing, as described herein.

## JURISDICTION

1. This Court has federal question jurisdiction over the instant action pursuant to 28 U.S. Code § 1331, as this action presents federal questions as to 42 U.S.C. § 1981, 42 U.S.C. § 1982, 42 U.S.C § 1983, and 42 U.S.C § 1985. Moreover, the Court has supplemental jurisdiction pursuant to 28 U.S. Code § 1367, as to the Human Rights Laws of the City and State of New York.

## VENUE

2. Pursuant to 28 U.S.C. § 1391, the venue is proper as the material events have taken place in this judicial district.

## JURY DEMAND

3. Plaintiff respectfully demands a trial by a jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## PARTIES

4. Plaintiff WB&B EXECUTIVE SEARCH, LLC is a business registered with the City and State of New York as a Minority-or-Woman-Owned-Business-or-Enterprise ("M/WBE"), owned by a person of Hispanic descent.

5. Defendant City of New York is a political subdivision of the State of New York, wherein the material events took place.

6. Defendant Department of Correction ("the Department") is a municipal agency of the City of New York, charged with maintaining custody of citizens charged with crimes and awaiting trial, sentence and serving municipal sentences, or those against whom the United States Citizenship and Immigration Services has lodged detainers, and who is in and continues to maintain the underlying discriminatory breach.

7. Defendant New York City Comptroller's Office ("the Comptroller") is a municipal agency of the City of New York, responsible for the payment of contracts, and who is in and continues to maintain the underlying discriminatory breach.

8. The Defendant Brad Lander is the Comptroller of the City of New York, responsible for the payment of contracts, and who is in, and continues to maintain the underlying discriminatory breach.

9. The Defendant Adrienne Adams is the Speaker of the New York City Council, which is responsible for overseeing the operation of City Government, including ensuring that there are no systemic discriminatory breaches of municipal contracts.

10. The Defendant Paul Shechtman is the General Counsel for the Department, who is who one of two officials through whom the Department acted, in informing WB&B Executive Search that the Department was thankful for its services rendered, that they could continue to render the underlying contractual services (for free), but that WB&B Executive Search would not be paid under the underlying municipal M/WBE awarded contracted.

11. The Defendant Kat Thomson is the Chief of Staff for the Department, who along with General Counsel Shechtman informed WB&B Executive Search that the Department was thankful for its services rendered, that they could continue to render the underlying contractual services (for free), but that WB&B Executive Search would not be paid under the underlying municipal M/WBE awarded contracted.

**FACTUAL BACKGROUND**

12. The City of New York awarded WB&B Executive Search a contract for purposes of using its services in identifying Executive Staff from around the United States who would serve in upper managerial positions of the Department.

13. In a letter dated October 11, 2022, Ava B. Rice, Assistant Commissioner of Contracts and Procurement for the Department, wrote WB&B Executive Search, referencing its having been awarded the Executive Search Contract ("Executive Leadership Search Agreement" or "ELSA").

14. Assistant Commissioner Rice's letter states in pertinent part,

> The agreement between the New York City Department of Correction (DOC) and WB&B Executive Search, has been duly registered with the New York City Comptroller's Office…for the services referenced above…The term of the contract is from October 1, 2022, through June 30, 2023. The total contract amount is $375,500.00 (Three Hundred Seventy-Five Thousand, Five Hundred Dollars).

15. The Executive Leadership Search Agreement resulted from *Nunez et al. v. City of New York et al., Civil Action No. 11-5845(LTS)(JCF)*, wherein the City of New York, as part of its overhaul of its correctional system (and criminal justice system), entered into a October 22, 2015, Consent to Decree, ordered by the District Court, agreeing to the oversight of a Federal Monitor for purposes of the City of New York reforming its correctional system.

16. In *Nunez*, the Parties had entered into a number of proposed action plans ultimately ordered by the Court, such as that of September 29, 2021, ("Second Remedial Order" or "SRO").

17. Pursuant to Section 1(ii) *Expanded Criteria for Department Leadership*, the Defendants agreed to "expanded [criteria of leadership] so that the Department is no longer limited to only selecting individuals from the current uniform ranks [to be supervisors] and can have the ability to also seek managers, from the broader corrections community [of the United States], with the required skills and willingness to improve the state of facility operations."

18. During the agreement of the SRO, a point that would later become a public source

of contention between the attorneys for the plaintiff class and the Defendants, the SRO inferred that there were civil service and local law limitations in hiring supervisors who did not come from the uniform ranks stating in part,

> [t]he appropriate City officials shall confer with the relevant State leadership to determine how this recommendation may be adopted. By October 14, 2021, the Defendants shall submit a report to the Court with a proposed approach to adopting and implementing this recommendation and a timeline to do so. To the extent that there are impediments to implementation of such an approach, the Defendants shall include in the report how these obstacles may be alleviated.

19.     The *Nunez* litigation, falling under the Prison Litigation Reform Act ("PLRA"), provides the District Court with powerful tools, irrespective of placing the agency into a federal receivership (i.e., authority to suspend impediments), although that power is not unfettered.

20.     The *Nunez* Plaintiffs and the Monitoring Team, largely in agreement that the Department's uniform staffs' (i.e., Members of Service or "MOS") collective systemic failure to engage in the best practices, made them collectively unsuited for leadership positions for purposes of reform, have as a cornerstone of the *Nunez* reform plan, the City's employing distinguished officials from outside of the Department's uniform ranks.[1]

21.     The Defendant City's October 14, 2021, letter report to the Court made no reference as to hiring of executive leadership, including any impediments.

22.     However, in a series of court appearances in the lead-up to an action plan, the

---

[1] Each of the *Nunez* Plaintiffs it seems, in focusing seemingly totally on the MOS, overlooked the reality that the collective failure of MOS, in too many instances, to engage in the best practices, had been a municipal desire that placed more of a premium on a compromised workplace that made the Department's uniform staff more easily subject to removal, as an invaluable budget-friendly tool, than a premium of penological integrity, which the *Nunez* reforms are in search of, resulting in the litigation spinning in a circle for approximately eight (8) years of litigation, and nowhere near attaining that penological integrity the Plaintiffs and the District Court are in search of, because of the foregoing narrow focus.

attorneys for the Plaintiffs, expressing their skepticism, noted that the Defendants had always cited civil service law that served as a pediment to hiring outside staff rather than from promoting from within the Department's uniform ranks.

23. Nonetheless, in June 2022, the *Nunez* litigants entered into a *Nunez* Action Plan Agreement ("NAP Agreement"), in which the Defendants claimed that there were no impediments.[2]

24. The NAP Agreement referenced a long-desired commitment of the Monitoring Team that the City and the Department hire leadership from outside the latter's uniform ranks.

25. Therefore, the NAP Agreement, at Section A *Immediate Initiatives to Address Harm*, Subsection (3)(b) *Supervision, Department Leadership*, provides for the hiring of numerous persons to replace the Department's current supervisory structure and supervisors.

26. In the October 28, 2022, Second Status Report on the NAP Agreement, under a section entitled *Department Leadership Changes*, the report notes in pertinent part,

> For many years, the Monitoring Team has emphasized that reforming a deep-seated culture requires leaders with an objective, independent, and external vantage point. Not only must the Department and facility leaders have subject matter expertise that allows them to quickly detect and call attention to poor practice, but they must also have experience from outside this Department, from a correctional system in which poor practice has not been normalized in the day-to-day work of its staff. As of the filing of this report, the Commissioner has appointed eight Deputy Commissioners, eleven Assistant Commissioners, six Associate Commissioners, one Executive Director, a Chief of Staff and a Deputy

---

[2] As shown herein, it is true that there were no impediments. While it is the case that hiring civilians rather than promoting from within the Department's uniform staff would conflict with certain state and local laws, given the abhorrent conditions of the Department, it was easily understood by the Stakeholders that any such laws would be suspended under the PLRA. As such, they were never an impediment or obstacle to the Monitoring Team's request to hire outside staff. Rather, the impediment or obstacle, which resulted in the Defendants resorting to a time-honored practice within the Department (i.e., discrimination), to frustrate the NAP Agreement and leave the Monitoring Team and the *Nunez* Plaintiffs believing that the challenge was getting people to come to the Department to work, while in truth the Defendants were merely seeking to afford the underlying union (i.e., Deputy Wardens Association ("DWA"), a reprieve of sorts, even if doing so meant the resulting instant discrimination.

>Chief of Staff. In particular, the Deputy Commissioners for Staffing, Security, and Operations all have significant experience managing correctional systems and facilities in other jurisdictions and many others in the leadership team have significant experience in correction and/or law enforcement.

27. Up until February 2023, the parties to the contract had been working well together, with WB&B Executive Search hard at work in identification, assessment, courtship, and recruitment of penological talent nationwide, with distinguished careers, and who were not "the[3] Hammer."

28. In fact, the April 3, 2023, Status Report for the NAP Agreement touts the success of the search for and landing of executive leadership.

29. However, the April 3, 2023, Status Report is premised upon what appears to be seemingly misinformation provided by the Defendants to the Monitoring Team as to why the Department had not been more successful in its search for executive leadership from outside the Department.

30. Seemingly unknown to the Monitoring Team, the *Nunez* Plaintiffs, and the State and Local Stakeholders is that the real reason for the Defendants' not being more successful in securing executive leadership is owing to a deliberate internal and discriminatory campaign not to so successful.

31. The NAP Agreement, represents a breakthrough, of sorts, where the City and many of the related Stakeholders, including the State of New York, mindful of the threat of the District Court's ability to act under the Prison Litigation Reform Act ("PLRA"), acquiesced to the Defendant City and Department's need for restructuring, allowing the latter hire civilians,

---

[3] "The Hammer" is a reference to person who would have a history or are otherwise known within their respective penological communities as being persons who beat inmates/detainees or were tolerant of such conduct.

never before employed by the Department, in lieu of promoting from within the Department's uniform ranks.

32. The fallout, which was relatively immediate, has resulted in the near elimination of the Department's uniform Wardens rank, and resulted in an outcry from surrogates of the DWA, as its members, Deputy Wardens ("DW"), Deputy Wardens In-Command ("D-WIC"), and Assistant Deputy Wardens ("ADW"), now had limited promotional opportunities, and labor under the threat of their ranks being further exterminated.[4]

33. About two years ago, as a result of the *Nunez* litigation and as a result of prudential economic reasons with a detainee population that had dropped to historic lows where it remains today, and at times lower, the City had its Department its first three ranks, with the fourth rank, *Warden*, having been effectively eliminated by the NAP Agreement.

34. With the past two (2) years fresh in their minds, and NAP Agreement effective codifying the City and its Department's willingness to further restructure the latter's managerial ranks, the DWA and its associates, having to answer to the former's membership (i.e., DWs, D-WICs, and ADWs), as to an entirely new landscape of vastly more limited promotional opportunities, and a continuing threat of further restructuring, surrogates of the DWA went on spirited campaign to inform the supervisory ranks of the threat of the NAP Agreement and that they would be next.

35. However, almost simultaneous to the Defendants sabotage of the ELSA, pursuant to the Defendants' time-honored discriminatory breach, the DWA Surrogate's spirited campaign

---

[4] At its height, whether the Department possessed more than average of 20,000 detainees a month or 9,000 such persons, its uniform rank consisted of nine ranks: (1) Chief of the Department, (2) Bureau Chief/Deputy Chief, (3) Assistant Chief/Supervising Warden, (4) Warden, (5) Deputy Warden In Command (i.e., D-WIC), (6) Deputy Warden/Facility Administrative Chaplain (i.e., DW), (7) Assistant Deputy Warden (i.e., ADW), (8) Captain, and (9) Correction Officer/Correction Officer Investigator.

came to a precipitous end, seemingly assured that despite the NAP Agreement, the ELSA would be frustrated, and that the Department's uniform managerial structure would be protected against further reform despite the NAP Agreement.

36. In contrast, the Defendants would handle the Monitoring Team and *Nunez* Plaintiffs by covering up their ELSA sabotage, and contend to them that the struggles to hire additional staff was that nobody wanted to come to work with the Department.

37. The debate of whether to close Rikers Island for more contemporary operations is a senseless debate, because whether one is on one side of the isle or the other, the fact of the matter is that every day thousands of inmates reside on Rikers Island, many of them for extended periods of times, and employees work such long hours on Rikers Island that they each occupy the same boat, which is that they are subjected to endless and dangeorous levels of methane emissions that will undoubtedly result in many thousands of early deaths caused by such exposure, suffer pregnancy[5] complications, adverse euphoric and emotional responses[6] giving rise violence, and compromised responses to dangerous conditions, such that whoever fights or acquiesces to remain, quite literally to being subject to excessive exposure to such colorless and odorless toxins except the indigent and/or minorities, who have no meaningful access to resources to effect meaningful change of dangerous conditions, the minority groups who make up the Department's workforce, the overwhelming majority of whom do not have a college education, and who represent protected classes of decades of historically disadvantaged groups.[7]

---

[5] Hopper, Leigh, *Living Near Natural Gas Flaring Poses Health Risks for Pregnant Women and Babies*. USC News. July 15, 2020. https://news.usc.edu/173335/natural-gas-flaring-pregnant-women-babies-health-risks-usc-research/

[6] Nevada Nano, *The Dangers of Methane Gas Poisoning and Exposure*. June 10, 2020. https://nevadanano.com/methane-gas-poisoning-and-exposure/

[7] In a letter dated July 30, 2021, the American Public Health Association, a conglomerate of many of the nation's forward thinking health organizations such as the Academy of Pediatrics, and the American Lung Association, wrote

38. The excessive methane gas released on Rikers Island are well documented, as are the long line of illness suffered by employees and inmates long exposed to them.

39. At a minimum, such causes or markedly exacerbates the very violence and mental disorders that both sides agree are problematic to any plan reform the Department, which concentrates about 80% to 90% of its operations on landfill releasing island that is known as Rikers.

### (A.) The Defendants Have a Long History of Discriminatory Indifference That They Utilize to their Benefit, in Many Instances, Economically, Disproportionately Depriving Minority and Women Groups of Compensation and Equal Protection, Just as They Have Done with WB&B Executive Search

40. The Defendants have a long past and current history of racial and gender discriminatory indifference, strongly suggestive of overt racial discrimination in furtherance of an agenda items, including pursuit of an economic gain, at the expense of the law.

41. In *Malcolm et al. v. City of New York, Civil Action No. 20-09641 (SDNY)*, the plaintiff class, disproportionately Hispanic and Black/African American, and women, sued as a result of the Defendants' deliberate failure to pay the class members.

42. The underlying CBAs allow for the Defendant City of New York to have uniform staff to work 24 hour and 32 hours straight, three or four days in a row, and that the Defendants need not pay such accumulated overtime so long as it is paid within a reasonable time.

43. However, the Defendants, forcing such staff to work insane hours, never paid the

---

the United States Environmental Protection Agency, detailing a nonexclusive list of the adverse effects of longer term exposure to methane exposure, a list that included damage to lung function, asthma, respiratory infection, bronchitis, chronic obstructive pulmonary disease (COPD), outbreaks of waterborne and diarrheal diseases, West Nile Virus, high levels of anxiety and post-traumatic stress disorder ("PTSD"), and cancer caused by organic compounds of methane gas. *EPA Reduce Methane Emissions*. July 30, 2021. American Public Health Association. https://www.apha.org/-/media/Files/PDF/advocacy/letters/2021/210730_EPA_methane_emissions.ashx

plaintiff claims, disproportionately Hispanic and Black/African American.

44. In *Santiago et al. v. City of New York et al., Index No. 159551/2021 (N.Y. Co. Sup. Ct.)*, and *Williams et al. v. City of New York (N.Y. Co. Sup. Ct.)*, the plaintiff-classes, disproportionately Hispanic, Black/African American, and woman sued, in relevant part as a result of the Defendant City of New York and the Department's (a) deliberate acquiescing to inmates' sexual abuse of the Departments women uniform staff (everything ranging from involuntary digital penetration of women uniform staffs' private part to masturbation exhibition without the Defendants taken any steps to stop such abuse), and (b) use of a facially neutral local law to deprive only Hispanic and Black/African American uniform staff of pay.

45. In *Smalls v. City of New York et al., Index No. 514572 (Kings. Co. Sup. Ct.)*, the plaintiff, of Black/African American descent, having worked more than 20 years and entitled to a full pension, was denied that pension, with the Defendant City of New York and its Department, engaging in a conspiracy in which they lied about Mr. Smalls retirement date, providing multiple dates for his retirement for purposes of denying Mr. Smalls his full pension upon the date of his retirement on July 1, 2011, through September 2014, where he was entitled to such as of July 1, 2011.

46. The Defendants' undue denial of WB&B Executive Search's money that they are obligated to pay to WB&B Executive Search, is *par for the course*, because WB&B Executive Search is a minority owned (i.e., Hispanic) business, the Defendants believed, at least in part that, they could deny payment to WB&B Executive Search in furtherance of their underlying mission

which is to slow down the underlying reforms.[8]

47.   Therefore, the Defendants' using their systemic discriminatory practices saw themselves as killing two birds with one stone: (a) having the municipality deny unto a minority owned business (i.e., WB&B Executive Search), a wealth-creating municipal contract opportunity, and (b) having the municipality undermine an overhaul that would further better conditions in a contemporary workplace (e.g., no toxins and continued wealth-creating employment either in the Department or some other municipal agency) for inmates and employees, both of whom are disproportionately minorities.

48.   As to the Defendants undue denial of payment, telling WB&B Executive Search that they could simply "work for free," they have never received any notice as to the breach of this contract, and they have never received any hearing as such.

---

[8] In a recent article (*See [NYC Correction Department Official's Scathing Resignation Letter Alleges Smear Campaign That Led her to Quit](#)*, Rayman, Graham. New York Daily News. April 17, 2023, 7:30 a.m.) Rachel Viau, formerly head of the Department's Professional Development, responsible for the professionalization of the Department's lower ranks (i.e., Correction Officers and Captains) alleges that the Department subjected her to a hostile work environment designed to frustrate Ms. Viau's mission to bring into the Department a more educated staff in those lower ranks. Thus, it appears that the City and the Department are hard at work attempting to sabotage their own objectives to overhaul and modernize the Department, outside of the watchful eye of the Monitoring Team and *Nunez* Plaintiffs (i.e., blocking the hiring of distinguished executive staff and more educated lower ranking staff).

## **CAUSES OF ACTION**

### **FIRST CAUSE OF ACTION**

**WB&B Executive Search, as an MWB/E, bring claims pursuant to 42 U.S.C. § 1981; 42 U.S.C. § 1982; 42 U.S.C. § 1983, 42 U.S.C. § 1985, the Fifth, and Fourteenth Amendments of the United States Constitution, where, as a member of a protected class, the Defendants' deprivation of payment and unlawful termination of the contract, without notice and an opportunity to be heard, constitutes unlawful racial discrimination.**

49. Plaintiff repeats and restates as if stated herein all averments set forth in Paragraphs "1" through "48" above.

50. Plaintiff, WB&B Executive Search is owned by person(s) of Hispanic descent, and therefore, is registered as a minority owned business, duly registered by the City and State of New York as MWB/E.

51. Defendants City of New York and the Department, as part of its commitment to mitigating the historic exclusion of minority owned business from municipal procurement opportunities, awarded the underling contract to WB&B Executive Search.

52. In breaching and effectively terminating the contract, the Defendants did so illegally, and did so, at least in part or substantially because WB&B Executive Search is a minority owned business.

53. Defendants' unlawful breach violates WB&B Executive Search's rights to equal protection under subsection (a) of Section 1981, and rights to participate in the terms of any contract and property rights emanating therefrom in violation of subsection (b) of Section 1981, and Sections 1982.

## SECOND CAUSE OF ACTION

**Plaintiff WB&B Executive Search brings a claim of violation of due process under the Fifth and Fourteenth Amendments of the United States Constitution against the Defendants.**

54. Plaintiffs repeat and restate as if stated herein all averments set forth in Paragraphs "1" through "53" above.

55. The Defendants failed to provide *any* notice to the Plaintiff as to the underlying termination of payment and contract.

56. The Defendants failed to provide *any* hearing to the Plaintiffs as to the underlying termination of payment and contract.

57. The Defendants failed to notify the Plaintiff of its rights, including a right to be notified of the basis for the termination and a right to hearing on such taking.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully requests relief and judgment, as follows:

(a) Awarding compensatory damages of $1,375,500, and punitive damages to be proved at trial;

(b) Awarding extraordinary, equitable, and/or injunctive relief as permitted by law, equity, and the state law, including moving expenses to plaintiffs;

(c) Awarding the plaintiffs reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(d) Such other and further relief as this Court may deem just and proper.

Dated: Woodhaven, New York,
April 20, 2023

CIVIL RIGHTS CONSORTIUM
ATTORNEYS FOR PLAINTIFFS

BY: *E. Dubois Raynor, Jr.*
E. Dubois Raynor, Jr., Esq.
Managing Attorney
89-07 Jamaica Avenue
Woodhaven, New York 11421
(855) 246-2776, Ext. 702

Sarah Badillo, Esq.
Staff Attorney
89-07 Jamaica Avenue
Woodhaven, New York 11421
(855) 246-2776, Ext. 704
